UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | Case No. 1:10-cr-143 |
| v. | ) | |
| | ) | *Collier / Lee* |
| DAI ZHENSONG | ) | |

## REPORT AND RECOMMENDATION

"The single biggest problem in communication," George Bernard Shaw quipped, "is the illusion that it has taken place." If communication is the transmission of information by use of symbols, then information can be conveyed only to the extent that the speaker and listener share the same understanding of those symbols. A speaker cannot know what her listener understands except by gauging her listener's reaction—that is, what the listener says or shows he understands. Further, the listener may voice his belief that he has understood, but without *a priori* knowledge of what the speaker intended to convey, he cannot confirm that belief. The dilemma is not merely academic; an officer of the law is often faced with the unenviable task of determining whether a suspect has understood the officer's communication. Constitutionally, if a suspect does not understand his Miranda rights well enough to freely exercise his will to waive them, then any confession is unlawfully obtained and cannot be used against him. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010). What, then, when a suspect voices understanding of his rights and waives them, but subsequently claims he misunderstood the information he was given?

Such is the case here. Defendant Dai Zhensong ("Defendant") moves to suppress statements

he made during an interview conducted by law enforcement agents on October 13, 2010 [Doc. 17].[1] Relying on *United States v. Short*, 790 F.2d 464 (6th Cir. 1986), Defendant argues his statements made in response to custodial police interrogation must be suppressed because he did not knowingly and intelligently waive his Miranda rights due to his limited understanding of the English language. Defendant contends that he cooperated during the interview only because he believed he was meeting with potential business clients, not law enforcement officers.

After carefully considering the law, evidence, and arguments, I **CONCLUDE** that Defendant's understanding of English was sufficient to comprehend his Miranda rights and that his waiver of those rights was voluntary, knowing, and intelligent. Moreover, whether or not Defendant truly understood the Miranda warnings is of no consequence here because I also **FIND** the agents had no contemporaneous reason to doubt his understanding. *See United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010); *Garner v. Mitchell*, 557 F.3d 257, 262-63 (6th Cir. 2009) (en banc). Accordingly, I **RECOMMEND** that Defendant's motion to suppress [Doc. 17] be **DENIED**.

## I. BACKGROUND

At the hearing, the Government offered the testimony of Ryan Mullins, a special agent with the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE"). Defendant offered his own testimony.

### A. Testimony of Agent Ryan Mullins

Agent Mullins testified as follows: Government officials intercepted a shipment of 68

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 18]. The Government filed a response and memorandum in opposition [Doc. 19; Doc. 21]. An evidentiary hearing was held on March 30, 2011. The parties also submitted post-hearing briefs [Doc. 23; Doc. 24].

automotive airbags being shipped from China to a Chattanooga address. The airbags were determined to be counterfeit. Agent Mullins and another agent, Brenda Dickson, secured a federal search warrant for the Chattanooga address, which they executed after they performed a "controlled delivery" of the airbags on September 9, 2010.[2] The customer, who was never arrested or charged, began cooperating with law enforcement and identified his supplier as "David."

On October 5, 2010, Agent Mullins met with the customer and the customer's attorney. The customer confirmed that his supplier of the counterfeit airbags, Defendant, had arrived in the United States from China the previous day, on October 4, 2010. The customer had submitted a necessary document to the authorities in order for Defendant to enter the United States on a business visa, had picked Defendant up at the Atlanta airport, and was allowing Defendant to stay at his home in Chattanooga.

At some point and through his attorney, the customer offered to deliver Defendant to law enforcement agents for an interview. On October 13, 2010, the date Defendant was scheduled to catch a return flight from Atlanta to China, the customer brought Defendant to the DHS/ICE office in Chattanooga. Agent Mullins knew Defendant believed the customer was taking him to the airport when they stopped at his office, but he did not know what the customer had told Defendant about the reason for stopping at the office. At the office, Defendant was greeted by Agent Mullins, who identified himself as an DHS/ICE agent and showed Defendant his badge. Agent Mullins' and Defendant's communications were all in English. Agent Mullins told Defendant he wanted to ask some questions about his business dealings with the customer and about the counterfeit airbags,

---

[2] The identity of the customer receiving the airbags was not disclosed during the hearing and will be referred to as the "customer" herein.

which he told Defendant had been seized. The customer remained in the office lobby for some time, apparently waiting to take Defendant on to the airport. Meanwhile, Defendant was escorted to the office "breakroom," where Agent Mullins, Agent Dickson, and a third agent conducted an interview.[3] Eventually, the customer was told he could leave because Defendant would be arrested.

Before he began asking Defendant questions, Agent Mullins told Defendant that if he needed a Mandarin interpreter, they would call one. Agent Mullins had access to a telephone interpreter at all relevant times. Defendant replied that an interpreter was not necessary, and that he understood and spoke English very well. Defendant told Agent Mullins that he was "fluent" in English and could read, write, and speak multiple languages. Based on Defendant's response, Agent Mullins decided that they would proceed with the interview without an interpreter but would call one if they had misunderstandings or bad communication. No interpreter was ever called. To Agent Mullins, Defendant at no time appeared to be at a loss for words or to have difficulty expressing himself. Agent Mullins described Defendant as "proficient" in English and "actually very well spoken." They did not have any difficulty conversing about the subject of the interview: Defendant understood which airbags they wanted to know about, and the only instance where Agent Mullins and Defendant "missed each other" was when Agent Mullins used the word "counterfeit" but Defendant used the word "fake."

At the beginning of the interview, Agent Mullins told Defendant he was not under arrest. Then, during the first half hour or so of the interview, Agent Mullins asked Defendant questions about Defendant's business practices, trademark infringement, and the counterfeit airbags.

---

[3] The Government did not provide any evidence with respect to the DHS office or the room where the interview took place—e.g., whether it bore any government insignia, its size, etc.

Defendant explained his business and began to explain "intellectual property rights," using that exact phrase. The purpose of the interview, Agent Mullins said, was to determine the extent of Defendant's knowledge about United States trademark and copyright laws.

After agents concluded that Defendant had demonstrated he understood "enough" about applicable laws, the agents began "contemplating" criminal charges, and Agent Mullins decided that Defendant needed to be advised of his Miranda rights. Initially, Agent Mullins stated this decision was made "just a few minutes" after the interview began, when Defendant had demonstrated that he appreciated the illegality of his conduct. On cross examination, he stated it was "maybe a half hour" after the interview began.

To give the Miranda warnings, Agent Mullins sat beside Defendant with a copy of a "standard" DHS/ICE English language statement of rights and waiver form[4] and told Defendant he was going to read the form aloud as Defendant read along. Agent Mullins asked Defendant if he wanted the form to be translated, but Defendant answered he did not. Centered in large font at the top of the form are the words "U.S. Immigration and Customs Enforcement," alongside the DHS seal. The form consists of two sections: a "statement of rights" and a "waiver." The statement of rights begins, "Before we ask you any questions, it is my duty to advise you of your rights. You have the right to remain silent. Anything you say can be used against you in court, or other proceedings." The statement of rights also explains that the person being questioned has the right to an attorney, and it concludes as follows: "If you decide to answer questions now, you still have the right to stop the questioning at any time . . . ." Agent Mullins explained each element of the

---

[4] The form was admitted without objection as Defendant's Exhibit 1.

statement of rights, and Defendant indicated he understood each. The "waiver" section of the form states, "I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily . . . ." Agent Mullins asked Defendant if he wanted to answer questions, and Defendant responded that he would answer questions but he did not want to sign the form.[5]

The bottom portion of the waiver form includes a blank to be filled in with the time of day a suspect was taken into custody. In reviewing this portion of the form with Defendant, Agent Mullins again told Defendant he was not in custody and did not fill in that blank. When Defendant's rights were explained to him, Agent Mullins believed Defendant was not, and had not been, in custody. In other words, Defendant was free to leave. Agent Mullins was not the case agent, and he had not yet been informed that there was sufficient probable cause to arrest Defendant. If Defendant had gotten up to leave, Agent Mullins "would have felt like [Defendant] was someone we should have arrested," but he did not believe he had the authority to arrest Defendant at that time.

Agent Mullins slid the unsigned form to the side and proceeded with the interview. Agent Mullins asked detailed questions and Defendant gave detailed answers. Specifically, Defendant gave statements about the manufacture of "fake" airbags and car dealership logos, saying that his business would purchase an airbag made by a major automobile manufacturer, then use a process of reverse engineering (though not using that term) to make a counterfeit version, even including the manufacturer's logo of the original product on which it was patterned. He called the airbags "fake," but he explained that although they were not made by the manufacturers whose logos they

---

[5] There is a handwritten note on the form which reads, "Stated would answer questions, but refused to sign. Read rights by hisself [sic]."

6

bore, they nonetheless worked properly. Defendant said he knew such business practices were illegal in both China and the United States, but said the practice was common in China, and the Chinese government did nothing to stop it. Defendant described how his business manufactured and shipped the airbags to customers in the United States. Defendant said he sold the fake airbags to customers for between $80 and $100 and that it cost him $40 to $50 to make them. Defendant explained he could not sell the airbags under his own company's name because customers would not buy them.

He said that he had come to the United States in the hope of developing other business relationships. Agent Mullins asked Defendant to identify his other U.S. customers, but Defendant refused to answer questions about his other customer(s). At some point during this phase of the interview, Defendant accompanied other agents to a different room where he showed them his website, which depicted airbags with the logo emblems digitally blurred.

About two hours after the interview began, around 4:15 or 4:30 p.m., the agents decided to arrest Defendant. When Defendant returned from showing his website, Defendant asked how long it would take to get to Atlanta because he was concerned about missing his flight. Agent Mullins replied that he was not going to be leaving. There was "very little" further conversation. Defendant merely asked where he would be going and how long he would be there. Agent Mullins handcuffed Defendant around 5:00 p.m. as required by DHS/ICE policy for transportation of prisoners, and Defendant was then transported elsewhere.

### B. Defendant's Testimony

Defendant testified on his own behalf with the aid of interpreters of the Chinese language. During the hearing, Defendant admitted to understanding some English. Defendant spoke in English

at least once, stating "I promise; I promise."[6] Defendant's testimony of recalled events was fairly consistent with Agent Mullins' testimony regarding the events. Their accounts diverged primarily with respect to Defendant's subjective understanding of the purpose of the interview and the identities of the interviewers. Defendant testified as follows:

Defendant is 27 years old, and he is from China. His parents are illiterate, but he graduated from community college with a major in electronic commerce. He studied English in both high school and college, and when asked to express his understanding of the English language as a percentage, he stated, "perhaps about 50%." Until October 4, 2010, Defendant had never been to the United States, and he was not familiar with the United States Constitution, the laws of the United States in general, or Miranda rights in particular. While he acknowledged that his business communications took place in English, Defendant stated that his understanding of English "is not in a sharp level." He explained that he understands English *words*, but does not know anything about the United States.

In May 2010, Defendant made acquaintance with his customer via the internet, and the customer indicated he wanted to sell Defendant's products. The customer invited Defendant to the United States. Defendant wanted to come because he always liked the United States and he wanted to see various places in the United States, such as Wall Street and California. Defendant received a letter of invitation from his customer, and he took it to the American Embassy in China to apply

---

[6] Defendant also appeared to understand some English. Defendant's attorney asked him a question about "instant messaging," but Defendant indicated he did not understand the interpreter's translation of the question. When Defendant's attorney rephrased the question with the phrase "communicating by computer," Defendant indicated his understanding before the interpreter had the opportunity to translate it.

for a visa, which he obtained.

Defendant arrived in the United States on October 4, 2010. The customer picked him up at the airport, and he stayed at his customer's home until October 13, 2010. On that date, Defendant packed his bags and got into his customer's vehicle with the understanding that his customer was going to drive him to the Atlanta airport. The customer indicated that he needed to make a stop first, and he told Defendant that he wanted him to meet his (the customer's) attorneys and friends. Defendant asked his customer what sorts of questions he would be asked, and the customer replied that they wanted to ask Defendant about his products and factory.

Defendant entered the office, where he exchanged casual greetings with Agent Mullins. He did not recall whether Agent Mullins showed him his badge or identified himself as a law enforcement officer. Defendant acknowledged it was possible that Agent Mullins identified himself but Defendant said he did not understand Agent Mullins was a law enforcement officer. Defendant believed the agents were his customer's friends or attorneys or something of the sort. When asked whether he ever understood that he was talking to federal agents, Defendant replied he did not have the "concept" of a federal agent. Defendant explained it was his first visit to the United States and, even in China, he had never encountered "this sort of issue" before. He did not understand that they were police, because in China police are identifiable by their uniforms. Here, the agents were wearing "common" clothes. Defendant admitted he did not feel "threatened."

Concerned that he might miss his flight, Defendant asked Agent Mullins if he could leave before he was shown the statement of rights and waiver form. Agent Mullins responded that Defendant could not go then. Defendant believed he could not leave unless and until he finished answering questions. Defendant stated, "as [he] remember[ed]," this exchange occurred before he

was read his Miranda rights. When presented with the statement of rights and waiver form by Agent Mullins, Defendant read and understood the "words" on the form. He did not, however, understand the words "court" or "attorney" at that time. Still, he understood the form to mean that he did not have to answer any questions if he did not want to, though he did not know its "real purpose." Defendant did not know if there was a Chinese analog to a Miranda waiver form. Defendant chose to answer questions, he said, because he wanted "to do more business."

Defendant did not think he needed an interpreter that day because his customer said they were meeting his friends and attorneys. He believed the customer and even called him "brother." Defendant was not aware he was talking to law enforcement during the interview. Near the end of the interview, one of the agents told him he was in "trouble" and that he "must" identify his other United States customers, but Defendant refused to do so; he testified he did not "want to." Defendant did not remember what the agents told him about why he was being arrested when he was placed under arrest. Defendant maintained that he did not ever realize who the agents were, even when they handcuffed him. He simply did not know "what's going on."

Defendant acknowledged that during the interview he told the agents that he manufactured fake airbags, but at the hearing, he recanted. He said that those statements were not true, and that he was merely a "middle man." He explained that he was trying to recruit new customers, and he was afraid that if they knew he was a mere middle man, they would simply go directly to his supplier to purchase the airbags. Defendant also testified emphatically that he did not even know that the airbags he was selling were fake.

C. **Findings of Fact**

While Defendant's testimony was consistent with Agent Mullins' in many respects, it was

10

not credible where it diverged. Specifically, I **FIND** Defendant did not testify credibly when he stated he was not aware that the airbags were fake or counterfeit. This finding weighs against Defendant's version of events where they may conflict with Agent Mullins' testimony, which I **FIND** was consistent and wholly credible. In particular, Defendant's version of the timeline of the interview is suspect. Defendant testified he was told he could not leave *before* he was read his Miranda rights, while Agent Mullins testified Defendant was told he could not leave only at the end of the interview. I **FIND** Agent Mullins' testimony more credibly recounts the timeline of the interview. Agent Mullins testified consistently that until the agents decided to arrest Defendant, a decision that was made after Defendant was read his Miranda rights, Defendant was in fact free to leave. Furthermore, Defendant's testimony that he believed he could not leave until he answered the agents' questions is somewhat inconsistent with his claims that he thought he was merely speaking to his customer's "friends," who presumably would have no authority to detain him. And finally, Defendant's memory simply was not reliable with respect to the early portion of the interview; he stated he could not remember whether the agents identified themselves as law enforcement officers, whether he was shown a badge, or whether he was asked about an interpreter. Therefore, Defendant's equivocal claim that he was told he could not leave before he was read his Miranda rights, "as I remember," is not entitled to much weight.

## II. ANALYSIS

Two sets of statements are at issue in this case. First, there are the statements Defendant made before he was given the Miranda warnings. Second, there are the more "detailed" statements Defendant gave after he was given those warnings.

### A. Pre-Miranda Statements

11

With respect to the first set of statements, Defendant argues that he was subjected to a custodial interrogation without the benefit of Miranda warnings.[7] "[G]eneral questioning of [persons] in the fact-finding process" does not require Miranda warnings. *Hoffner v. Bradshaw*, 622 F.3d 487, 512 (6th Cir. 2010) (quoting *Miranda v. Arizona*, 384 U.S. 436, 477 (1966)). The Miranda requirements become applicable only when a person is subjected to a custodial interrogation. *Id.* at 511. A person is in custody when, given the circumstances surrounding the investigation, a reasonable person would have felt he was "not at liberty to terminate the interrogation and leave." *Id.* Factors in this analysis include "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010). Not included among these factors is the consideration of whether the officers intend to arrest the interviewee at some later point. *Id.*

Based on the totality of the circumstances surrounding this initial phase of the interview, I **CONCLUDE** that a reasonable person in Defendant's position would not have felt incapable of terminating and leaving the interview. The interview took place in a break room where Defendant

---

[7] Defendant also appears to argue that the evidence fails to show he actually made any incriminating statements during this first period of time. Before Miranda warnings were given, Defendant contends, the exchange was limited to introductions, an inquiry about the need for an interpreter, Defendant's query whether he could leave, and Defendant's explanation of his understanding of intellectual property law. If no incriminating statements were given during this period, as Defendant contends, the only issue is whether his Miranda waiver was valid. To the contrary, however, Agent Mullins credibly testified that Defendant gave statements about his activities and his knowledge of the law that showed he understood his activities to be unlawful, and that Defendant's later statements covered the same ground in more detail.

was offered a beverage, and it lasted only about thirty minutes. Defendant was not physically restrained, and his customer was waiting to take him to the airport after the interview concluded. Defendant admitted he did not feel threatened. Significantly, as explained above, I do not find Defendant testified credibly when he claimed he was told he could not leave prior to receiving the Miranda warnings. Instead, I credit Agent Mullins' testimony that Defendant was in fact free to leave, and indeed, was even told he was not in custody when he was shown the Miranda waiver form. Even by his own testimony, Defendant could not reasonably have believed he was not free to terminate the interview. He testified that he believed he was simply meeting potential business clients, and a reasonable person would not believe that mere business associates would have any authority to force him to answer questions or prevent him from leaving. Accordingly, I **CONCLUDE** Defendant was not in custody during the initial phase of the interview, and Miranda warnings were therefore not required at that time.[8]

### B. Post-Miranda Statements

After informing a suspect of his Miranda rights, police officers may infer that he has waived those rights from his subsequent willingness to answer questions, even if he has refused to sign a written waiver. *Berghuis*, 130 S. Ct. at 2261; *United States v. Eicher*, 1991 WL 29199, at *2 (6th Cir. 1991) (Table). The government must prove by a preponderance of the evidence that the waiver,

---

[8] A defendant's statements, whether taken in custody or not, must be given "voluntarily" in order to be admissible against him. *See United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009) (noting that the elicitation of involuntary non-custodial statements violates due process). A statement can be found involuntary, however, only if it was motivated by coercive governmental conduct, *id.*, which requires more than a subjective misunderstanding. *See Berghuis*, 130 S. Ct. at 2260 (noting that a "voluntary" statement is one not produced by "intimidation, coercion, or deception"). No such coercive-governmental-conduct argument has been made by Defendant.

13

whether express or implied, was voluntary, knowing, and intelligent. *Berghuis*, 130 S. Ct. at 2261. In other words, the waiver must be made in the absence of coercion and with "full awareness both of the nature of the right . . . and the consequences of the decision." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the investigation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* Thus, *Moran* divides the waiver inquiry into "two dimensions: voluntariness and comprehension." *Garner*, 557 F.3d at 263.

Here, Defendant does not argue his statements were not voluntary or that there was any overt police coercion. Instead, he argues he lacked comprehension, claiming he did not understand the purpose of the interview because of a language barrier. Certainly, a language barrier is one factor in determining whether a suspect appreciated the consequences of a decision to speak with police. *United States v. Alaouie*, 1991 WL 144479, at *4 (6th Cir. 1991) (Table). *See also Al-Cholan*, 610 F.3d at 954; *Short*, 790 F.2d at 469. I **FIND**, however, that Defendant's claimed inability to comprehend the Miranda warnings, including their "purpose," is dubious.

First, prior to the interview the agents were aware that Defendant had conducted business via computer in English. Second, before taking Defendant into custody, the agents introduced themselves as law enforcement officers and offered Defendant a translator, but Defendant declined the offer, telling the agents he was fluent in English and other languages. During the interview, moreover, Defendant responded to questions in English and was able to discuss the subject of intellectual property law in English. The only occasion on which Agent Mullins and Defendant "missed each other" was Defendant's use of the word "fake" instead of "counterfeit." Even this was not a true miscommunication, however, because Defendant was able to explain in English what he

14

meant by "fake"—that his products worked just as well as the genuine products, but were cheaper because they were made through a process of reverse engineering.

Regarding the waiver form itself, Defendant read it and it was read aloud to him. The form was emblazoned with an official seal, and its heading showed it was an official document of United States Immigration and Customs Enforcement. The agents could reasonably have expected Defendant to be familiar with that agency because of his international business dealings and recent travel to the United States. In addition, Defendant declined Agent Mullins' offer to have the Miranda waiver form translated, and Defendant indicated he understood each element of the recitation. Defendant also declined to sign the form, indicating that he understood it had some legal significance. At the hearing, Defendant conceded he understood his right to refuse to answer questions, and he did in fact refuse to answer questions about his other business contacts in the United States. Based on the credible evidence, I **FIND** that Defendant understood English well enough to comprehend both the nature of his Miranda rights and the consequences of speaking to police. Consequently, I **CONCLUDE** Defendant's waiver of those rights was voluntary, knowing, and intelligent.

Furthermore, even if a language or cultural barrier prevented Defendant from actually and fully understanding the Miranda warnings—contrary to the credible evidence—Defendant indicated to the agents that he understood the Miranda warnings and wished to cooperate. A defendant's comprehension must be measured "primarily from the perspective of the police." *Garner*, 557 F.3d at 263. The *Garner* court explained that the Miranda warnings are intended "not [to] protect[] people from themselves but [to] curb[] abusive practices by police officers." *Id.* at 262 (quoting *Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998)). Under applicable precedent, a waiver may be

15

invalidated only if the police have a "contemporaneous reason" to doubt that the defendant understood his rights. *Al-Cholan*, 610 F.3d at 954. Thus, "later-developed evidence" of a defendant's actual capacity to understand the warnings may be material, but only if it tends to show "that the police should have known that the defendant could not understand." *Garner*, 557 F.3d at 264.[9]

The officers questioning Defendant had no reason to doubt his comprehension. To be sure, Defendant is young, and the agents had no reason to think he had any familiarity with the United States justice system, but Defendant was well-spoken and voiced his understanding at each opportunity during the interview. Like the defendant in *Garner*, Defendant's "conduct, speech, and appearance at the time of the interrogation indicated that his waiver was knowing and intelligent." *See* 557 F.3d at 265. Defendant's later testimony that he did not subjectively understand the Miranda warnings is therefore unavailing because the agents had no contemporaneous reason to doubt his understanding. Accordingly, I **CONCLUDE** that Defendant validly waived his Miranda rights.

---

[9] Unlike the Seventh Circuit Court of Appeals, I do not find this en banc ruling by the Sixth Circuit Court of Appeals to be irreconcilable with the admonition in *Berghuis* that the absence of coercion, "standing alone," is insufficient to validate a waiver without an "additional showing that [the defendant] understood his rights." *See Collins v. Gaetz*, 612 F.3d 574, 587 n.6 (7th Cir. 2010). *Garner* acknowledges this two-pronged test, then resolves a secondary question: whose perspective matters in making this "additional" showing? The rule stated in *Garner* frankly recognizes that police simply cannot know or prove what a defendant subjectively knows or understands. 557 F.3d at 262 ("[T]he officers questioning [the defendant] had no way to discern the misunderstanding in [his] mind."). Still, the burden rests on the government to prove a valid waiver because the *objective*, external evidence of a defendant's comprehension is accessible to the government. *See United States v. Garibay*, 143 F.3d 534, 539 (9th Cir. 1998) (analyzing whether a defendant knowingly waived his rights despite his poor language skills and applying a totality of the circumstances test consisting of objective factors such as whether the defendant "appeared to understand" his rights).

**III.     CONCLUSION**

For the reasons above, I **RECOMMEND**[10] that Defendant's motion to suppress [Doc. 17] be **DENIED**.

                                                  s/ *Susan K. Lee*
                                                  SUSAN K. LEE
                                                  UNITED STATES MAGISTRATE JUDGE

---

[10] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).