UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No: 1:10-CR-143 |
| v. ) | |
| ) | Chief Judge Curtis L. Collier |
| DAI ZHENSONG ) | |

**MEMORANDUM**

Before the Court is Defendant Dai Zhensong's ("Defendant") motion to suppress evidence obtained during an interview conducted in October 2010 (Court File No. 17). Defendant asserts his Fifth Amendment rights were violated. The Court referred the motion and request to United States Magistrate Judge Susan K. Lee pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) (Court File No. 18). Judge Lee held an evidentiary hearing on the matter on March 30, 2011 (Court File No. 22) and issued a Report and Recommendation ("R&R") on the motion (Court File No. 26). Defendant filed timely objections to the R&R (Court File No. 27), and the Government filed a response (Court File No. 28). For the following reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 26). Defendant's motion to suppress will be **DENIED** (Court File No. 17).

I.  STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must "make a de novo determination of those portions of the [R&R] to which objection is made" and "may accept, reject, or modify, in whole or in part," the magistrate judge's findings or recommendations. The Court has "broad discretion" in conducting a *de novo* determination and is not required to rehear any contested testimony. *United States v. Raddatz*, 447 U.S. 667, 674, 681 (1980). "Congress intended to permit

whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on the magistrate's proposed findings and recommendations." *Id.* at 676.

## II.     RELEVANT BACKGROUND

Defendant is a twenty-seven year old male from China (Court File No. 26). Until October 2010, Defendant had never visited the United States (*id.*). Defendant first learned to speak English in high school, and then in community college, where he majored in electronic commerce (Court File No. 25, Transcript of Suppression Hearing ("Tr.") at 57-59). According to Defendant, he understands only fifty percent (50%) of the English language (*id.*).

Some time after graduating from college, Defendant started his own business selling air bags (*id.* at 58:21-25). In May 2010, Defendant made contact with a customer, via the internet, whereby the customer indicated to Defendant he would like to sell Defendant's products on the internet (*id.* at 57:15-25). The customer invited Defendant to come to the United States for a visit (*id.* at 60:22-23). Defendant arrived in the states on October 4, 2010, and he was scheduled to return to China on October 14, 2010 (*id.* at 62).

On October 13, 2010, Defendant got into the customer's vehicle expecting the customer to take him to the airport in Atlanta, Georgia (*id.* at 63). According to Defendant, the customer told Defendant he needed to make a stop so he and Defendant could meet with some of the customer's friends and attorneys (*id.* at 63:1-23).

However, when arrived, he was greeted by agents with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"). The agents proceeded to interview Defendant, and at the conclusion, Defendant was arrested for trafficking counterfeit air bags through

2

his business, in violation of 18 U.S.C. § 2320. Defendant now seeks to suppress statements made during the interview (Court File No. 17).

### A. Agent Mullins's Testimony

During the suppression hearing, Agent Ryan Mullins, an ICE agent with the Department of Homeland Security, testified that at some point prior to October 2010, ICE agents received packages through FedEx which contained counterfeit air bags (Court File No. 25, Tr. at 7:5-15). Agents then "took those packages[,] and in an undercover capacity [] delivered them to the customer,[1] who accepted the packages" (*id.* at 7:13-15). The customer informed the agents he had been dealing with Defendant, who was coming to the United States from China to develop further business relationships (*id.* at 7:17-22).

Then, on October 13, 2010, the customer brought Defendant to the Department of Homeland Security's field office in Chattanooga, Tennessee instead of taking Defendant to the airport at the request of the agents (*id.* at 7:1-4). When Defendant arrived, Agent Mullins immediately introduced himself to Defendant as an ICE agent, and he showed Defendant his badge and credentials (*id.* at 8:11-15). The other two agents present also showed Defendant their badges and credentials (*id.* at 8:17-21).

Once the interview began, Defendant was asked about his ability to understand and speak English. Agent Mullins inquired whether Defendant needed an interpreter, and Defendant told him that would not be necessary (*id.* at 9:2-10). According to Agent Mullins, there was no indication Defendant was not fluent in English or that he could not understand English. Accordingly, all of Agent Mullins and Defendant's communications were in English.

---

[1] Based on the evidence, this was the same customer who invited Defendant to the United States.

Agent Mullins then proceeded to ask Defendant about some of his business dealings with the customer and about the counterfeit air bags, which the agents seized. They discussed the types of goods Defendant's company produced, and they discussed intellectual property rights (*id.* at 10:12-19; 11:13-17).

The entire interview lasted approximately two and a half hours. Specifically, Defendant arrived at the office at around 2:30 p.m. (*id.* at 21:6-7). On direct examination, Agent Mullins testified Defendant was read his *Miranda* rights at 2:45 p.m. after Defendant had demonstrated to the agents "a knowledge of the fact that [he had] violated the U.S. law" (*id.* at 21:10-18). However, during cross-examination, Agent Mullins stated he had been questioning Defendant approximately half an hour before Defendant was read his *Miranda* rights (*id.* at 38:4-7). Nonetheless, the agents did not determine whether they were going to take Defendant into custody at that time (*id.* at 21:10-18).

In regards to informing Defendant of his rights, Agent Mullins read the *Miranda* warnings from a standard form used by the Department of Homeland Security (*id.* at 22:11-13). Agent Mullins also allowed Defendant to read the form as it was being read to him. In addition, he asked Defendant if he wanted to have the *Miranda* warnings read or translated into Mandarin, Defendant's native language (*id.* at 22:15-18). Defendant declined the use of an interpreter, and he agreed to continue answering the agents's questions; however, he refused to sign the waiver form (*id.* at 23:2-4). In addition, Defendant seemed to exercise knowledge of his rights as outlined by the form when he refused to answer some of Agent Mullins's questions (*id.* at 23:12-19).

Finally, about two hours after the interview began and after Defendant showed the agents his company's website, the agents decided to take Defendant into custody. Defendant did inquire about leaving to go to the airport, but only after the agents had decided to arrest Defendant (*id.* at

4

48:4-12). Defendant, however, was not handcuffed until approximately 5:00 p.m. (*id.* at 53:21-22).

B.   **Defendant's Testimony**

Defendant, in contrast, does not recall Agent Mullins identifying himself as a federal agent when Defendant arrived at the Chattanooga field office of the Department of Homeland Security, Immigration and Customs Enforcement (*id.* at 64:18-21). If Agent Mullins did so, Defendant did not understand such introduction as he had no "concept" of the meaning of a federal agent and the agents wore "common" clothes (*id.* at 64:22-24; 67:4-7; 91:15-16). Rather, Defendant thought he was speaking with his customer's friends or attorneys (*id.* at 63:22-23).

Defendant does, however, recall reviewing the form outlining his *Miranda* rights (*id.* at 68:10-11). Nonetheless, he claims he did not know the purpose of the form. While he understood he could answer some questions and refuse to answer others, he did not realize his statements could be used against him in a criminal proceeding (*id.* at 69:6-12). In addition, Defendant contends he asked whether he could leave prior to being read the *Miranda* warnings, whereby Agent Mullins responded in a manner that indicated Defendant was not free to go (*id.* at 70:4-25). As a result, Defendant believed he could not leave until he finished answering questions (*id.* at 71:6-8).

On cross-examination, Defendant testified about why he did not ask for an interpreter during his interview with Agent Mullins. He explained that since he believed he was having a conversation with his customer's friends or attorneys, there was no need to have a third party involved (*id.* at 74:21-23).

In addition, Defendant argues he did not speak truthfully to Agent Mullins, and he did not produce counterfeit air bags to be shipped to the United States (*id.* at 75:22-24; 77:8-12). Rather, because he thought he was speaking with friends, he was trying to impress Agent Mullins by stating

5

he produced "fake" air bags to garner more business (*id.* at 76:2-11). He simply wanted to create additional business relationships, and he did not want his customer's "friends" to know he was just a "middle man."

### C. Defendant's Objections

Now before the Court is the magistrate judge's R&R recommending this Court deny Defendant's motion to suppress evidence (Court File No. 26). In response, Defendant specifically objects to three findings as stated in the R&R (Court File No. 27). First, Defendant objects to the finding that he knowingly and voluntarily waived his *Miranda* rights and that his understanding of the English language was sufficient to do so (*id.*). Second, Defendant objects to the finding that Agent Mullins's testimony was more credible than Defendants (*id.*). Finally, Defendant "objects to the finding that a reasonable person in [Defendant's] position would not have felt incapable of leaving the interview" (*id.* at 5).

## III. ANALYSIS

### A. Credibility of Testimony

Defendant objects to the finding that Agent Mullins's testimony was more credible than his on the ground Agent Mullins's time-line of events was inconsistent. However, the magistrate judge, as trier of fact, had a firsthand opportunity to hear the testimonies of the witnesses to determine their credibility. Therefore, the Court will "defer to the credibility finding by the magistrate judge who had an opportunity to evaluate the demeanor and consistency of the witnesses' testimony," and the Court finds it is not improper to do so. *United States v. Lowe*, No. 3:09-CR-110, 2010 WL 1491417, at *1 (E.D. Tenn. April 12, 2010); *see also United States v. Navarro-Camacho*, 186 F.3d 701, 708 (6th Cir. 1999) ("Where there are two permissible views of the evidence, the factfinder's choice

between them cannot be clearly erroneous.").

B.     **Freedom to Leave Interview**

Defendant also objects to the R&R on the grounds that a reasonable person in Defendant's interview would have not have felt capable of leaving the interview (Court File No. 27).[2] "The Fifth Amendment to the United States Constitution states that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" *United States v. Protsman*, 74 F. App's 529, 532 (6th Cir. 2003) (citing U.S. Const. amend. V.). As a result, no criminal suspect may be subjected to custodial interrogation without being advised of his *Miranda* rights. *See generally, Miranda v. Arizona*, 384 U.S. 436 (1966). However, where there is a non-custodial interview in which a suspect's "freedom to depart [is not] restricted in any way," *Miranda* warnings are not required. *Oregon v. Mathiason*, 429 U.S 492, 495 (1977).

"The Sixth Circuit employs a totality of the circumstances approach when deciding whether or not a suspect is in custody." *Protsman*, 74 F. App'x at 533. "[W]hether a reasonable person in [Defendant's] position would have felt free to leave [the interview] is only one of the factors used to determine whether [Defendant] was in custody." *Singleton v. Carter*, 74 F. App'x 536, 544 (6th Cir. 2003). Other factors include (1) "the purpose of questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of

---

[2]Defendant also objects to the magistrate judge's finding that the interview only lasted about thirty minutes, rather than two and a half hours (Court File No. 27). However, it is clear from the R&R, the magistrate judge analyzed Defendant's motion to suppress by determining the admissibility of statements Defendant made prior to being *Mirandized* and after being *Mirandized* (Court File No. 26). The Court finds this analysis was proper. Although Defendant is correct that the entire interview lasted over two hours, the evidence shows Defendant was read his *Miranda* rights within thirty minutes of the interview. The magistrate judge determined that during this "initial phase" of the interview, Defendant was not in custody and *Miranda* warnings were not required (*id.* at 13).

7

custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during the questioning; and whether the suspect initiated contact with the police . . ." *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000) (quoting *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998)). Applying these factors to this case, the Court concludes Defendant was not subjected to a custodial interrogation during the first thirty minutes of the interview; therefore, *Miranda* warnings were not required.

Defendant argues, however, a reasonable person in his position would not have felt free to leave the interview because "three agents conducted the interview," and "[Defendant] felt like he had to finish answering questions [before] he could leave" (Court File No. 27 at 3). In addition, at the suppression hearing, Defendant testified he asked about leaving for the airport prior to being *Mirandized*, and Agent Mullins responded that Defendant was not free to go.

However, the Court agrees with the magistrate judge's findings that such contentions are not consistent with Defendant's prior statements and testimony. Specifically, Defendant asserted he did not know Agent Mullins and the other two agents were law enforcement officers; rather, he thought they were associates of his customer. As stated in the R&R, Defendant thought these were individuals "who presumably would have no authority to detain him" (Court File No. 26 at 10). Defendant also urges that he gave Agent Mullins false information in order to "impress" him and to further his business relationships in the United States.

In regards to the other factors, there were no other indicia of custody at the time. The interview took place in a break room, and the agents offered Defendant a beverage. Defendant was not handcuffed, and he admitted he did not find any reason to feel threatened. Furthermore, Defendant's customer waited for Defendant to take him to the airport, corroborating the fact there

8

was no present knowledge Defendant would be taken into custody.

### C. Waiver of *Miranda* Rights

Even if the Court assumes, without deciding, Defendant was subjected to custodial interrogation after the first thirty minutes of the interview, Defendant's Fifth Amendment rights were not violated because he was *Mirandized*. Nonetheless, Defendant objects to the R&R on the grounds he did not have sufficient understanding of the English language to understand his *Miranda* rights and voluntarily waive them (Court File No. 27).

"Statements made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights 'voluntarily, knowingly, and intelligently.'" *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)). This Court should determine whether Defendant comprehended those rights and voluntarily waived those rights from the "perspective of the police." *Id.* (quoting *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009)).

Here, the evidence introduced during the suppression hearing suggests Defendant knowingly and voluntarily waived his *Miranda* rights. Although Defendant indicates there was a language barrier and the *Miranda* rights were read entirely in English, there was no indication to Agent Mullins that Defendant did not have a sufficient understanding of the English language. *See United States v. Alaouie*, 940 F.2d 663 (Table), No. 90-1970, 1991 WL 144479, at *4 (6th Cir. August 1, 1991). Indeed, when asked if he needed an interpreter, Defendant refused one. Instead, Defendant displayed his knowledge of intellectual property rights while speaking in English, and he used certain business related terminology. When given the opportunity to read the *Miranda* warnings, Defendant failed to offer any indication he did not understand those rights. Rather, he demonstrated an understanding of those rights when he refused to sign the waiver form, and he refused to answer

9

certain questions asked by Agent Mullins.

## IV. CONCLUSION

For these reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 26). Defendant's motions to suppress will be **DENIED** (Court File No. 17).

**An Order shall enter.**

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**